**UNCASVILLE MFG. CO. v. COMMISSIONER OF INTERNAL REVENUE.**

No. 52.

Circuit Court of Appeals, Second Circuit.

Feb. 1, 1932.

CHASE, Circuit Judge, dissenting in part.

John E. Hughes, of Chicago, Ill., for appellant.

G. A. Youngquist, Asst. Atty. Gen., and Andrew D. Sharpe and Sewall Key, Sp. Assts. to Atty. Gen., of Washington, D. C., (C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and Dean P. Kimball, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., of counsel), for appellee.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

The petitioner was a company making cotton cloth (denim) in two factories in Connecticut and keeping its books on an accrual basis. It returned its income taxes for the years 1916, 1917, 1918, 1919, 1920, and 1922, and asserts that the Commissioner assessed deficiencies for each year, to review which it filed two petitions with the Board of Tax Appeals. The Board held that, as the Commissioner had assessed no deficiency for 1917, it had no jurisdiction for that year and entered an order fixing the deficiencies only for 1916, 1918, 1919, 1920 and 1922. As the question of its jurisdiction is a preliminary point, we dispose of it first. Strictly it is not before us, because, so far as appears, the Board entered no order, declaring that it was without jurisdiction, as required by section 1217 (d), title 26, of the U. S. Code (26 USCA § 1217). Such an order must be entered before we ourselves have jurisdiction, but, since the defect is purely procedural, and the opinion of the Board has dealt with the point, to avoid further delay we will say what we think should be done, leaving it to the Board to enter the proper order.

In March, 1923, the Commissioner provisionally assessed a deficiency of $7,746.-36 against the company, for the abatement of which it later filed a claim, along with a claim for a refund of $10,000. On November 7, 1924, the Commissioner rejected $10,083.-90 of these two claims, and allowed $7,662.-46. This action he subsequently and finally confirmed by a "deficiency letter" of November 23, 1925, covering all the years in dispute, giving credit for the smaller amount in the year 1917. The jurisdiction of the Board depends upon section 283 (f) of the Act of 1926, 26 USCA § 1064 (f) which the facts fully satisfy if any "deficiency" had been "assessed." Were we dealing with the language of the Act of 1924, it would be easier to assume that the definition of "deficiency" in section 273 (1), 26 USCA § 1047(1) applied to the same word when used in section 283 (f). There would indeed be verbal difficulties even then, because the definition speaks of taxes "imposed by this title" and a tax for 1917 was not such. Still, since the section begins with the statement, "as used in this title the term 'deficiency' means," it would perhaps be an excess of literalism to say that the definition did not cover "deficiency," as used in section 283 (f) though the taxes there in mind are imposed under other acts. Be that as it may, when section 273 (1) was taken over into the Act of 1926, it began as follows: "As used in this chapter, in respect of a tax imposed by this chapter the term 'deficiency' means." This presupposes some deliberate change, and there is a double reason for saying that the definition did not apply to section 283 (f). For these reasons it seems to us impossible to say that the meaning of the term, "deficiency," in section 283 (f) is to be found in section 273 (1) in the sense that the statute

so commands. Strictly, the meaning of the word is left at large. However, we think it reasonable to accept the definition as a relevant, though not imperative, standard of reference, for in our search for intent, we are entitled to suppose, when nothing to the contrary is intimated, that the same word was not used with a double meaning in the same title. The fact that we need not conclusively so construe it, does not impair the propriety of our using the definition as a guide.

Even so the meaning is somewhat obscure. A deficiency is the difference between the "return" as corrected and "the tax imposed." The return is to be corrected by adding all deficiencies "previously assessed" or paid and subtracting all sums, abated, refunded, credited or otherwise repaid. If the Commissioner at an earlier stage of the proceedings before him, assesses a deficiency which the taxpayer disputes, and if later he confirms his action and imposes a tax, including that deficiency, there will nevertheless be no deficiency, if this language be read literally. The "previous" deficiency added to the return will be the same as the tax imposed. A fortiori if the Commissioner abates a part of the deficiency and grants a certificate of over assessment pro tanto. Yet it is hard to believe that Congress intended to take away any right of review in such a situation. De facto the taxpayer has been assessed a deficiency and has a complaint. The phrase "deficiencies previously assessed" must mean, we think, those which are conceded by the taxpayer, else the result merely depends upon what items the Commissioner reserves for his final action. Such was apparently the understanding of the Board in Austin Co. v. Commissioner, 8 B. T. A. 628. We think it the right one, and we hold that there was here a deficiency of $83.90. Therefore that tax for the year 1917 will be redetermined in accordance with what we say below.

■■ Three questions arise upon the merits; a fourth, which concerned a patent used by the company, having been abandoned upon the argument. The first of the three is of the deduction of a state tax for 1918, calculated upon the company's federal return. As the Commissioner increased the income for 1918, and the state tax was calculated upon it, it resulted that the state tax was also proportionately increased. The dispute is as to when the increase in the state tax may be taken as a deduction, whether for the year 1918, or when it was finally fixed as a tax upon the income as increased by the Com-

missioner. The company insists that it should be deducted from the income for the year 1918, because it had then accrued. The Commissioner refused to allow it as a deduction for that year, and the Board confirmed his ruling. We think that the case falls within U. S. v. Anderson, 269 U. S. 422, 46 S. Ct. 131, 70 L. Ed. 347, not Lucas v. American Code Co., 280 U. S. 445, 50 S. Ct. 202, 74 L. Ed. 538. All the facts upon which the calculation depended had been fixed before the expiration of the year 1918. Differences could arise, and did, as to the amount of the company's income for that year, but they were due to the proper appraisal of its property, and possible disputes as to the meaning of the law. The computation was uncertain, but its basis was unchangeable; it was unknown, not unknowable on December 31, 1918. That is the test, and that was not the situation in Lucas v. American Code Co., where the employee's claim was subject to variation according as he lived and conducted himself in the future. Nor does it make any difference that the company had not accrued the additional deduction on its books in the year 1918, though we may presume that it carried the Connecticut tax at the amount of its income as returned. It could not be expected to carry a suspense account against possible increases by the Treasury. If the books were in general upon an accrual basis, and accrued income taxes, state and federal, that was enough. The discussion of the entries in Lucas v. American Code Co. was to show that the taxpayer did not itself regard the item as falling due in the year in question.

■ The second question arises from the calculation of the company's invested capital used in fixing its excess profits tax. The Commissioner reduced this by certain deficiencies for earlier years, 1909–1916, inclusive, assuming that those were collectible. It is conceded that if they were not, the deductions were unauthorized, and the point therefore turns upon their validity. All the deficiencies were assessed after June 2, 1924—the date when the Revenue Act of that year went into effect—and on that day the time had already expired, when any assessment could be made or a tax collected. However, the company gave waivers after June 2, 1924, which, if valid, authorized the Commissioner to assess and collect deficiencies, and acting upon these he did assess them.

Confessedly, had the time for assessment expired after June 2, 1924, the waivers would have been good, though executed after the

expiry of the time to assess or collect. Burnet v. Railway Equipment Co., 282 U. S. 295, 51 S. Ct. 137, 75 L. Ed. 349. However, section 278 (e) of the Act of 1924 (26 USCA § 1062 note) declared that the section as a whole should not allow the assessment or collection of a tax, barred by existing limitations on June 2, 1924. Subdivision (c) of section 278 (26 USCA § 1060 note) is necessary to the assessments because they depended upon the waivers, and there was no other law regulating waivers in effect after June 2, 1924. Thus if subdivision (e) confines subdivision (c) to cases where the assessment was not barred on June 2, 1924, the company is right. In spite of some intimations in Burnet v. Chicago Railway Equipment Company, which, however, expressly reserved the point, we think that an analysis of section 278 (26 USCA §§ 1058, 1059 and §§ 1060–1062 notes) as a whole does not admit of any other construction. As some confirmation we may note that in Russell v. U. S., 278 U. S. 181, 49 S. Ct. 121, 73 L. Ed. 255, subdivision (d), which concerns not assessment but collection, was confined by the second part of subdivision (e) to assessments made after June 2, 1924.

Subdivision (a) extends indefinitely the time for all assessments where the return was fraudulent, or there was none. This had already been done by second proviso of section 250 (d) of the Act of 1921 (42 Stat. 265), and section 250 (d) of 1918 (40 Stat. 1083) had the same provision for fraudulent returns, though none for a failure to make any. Before 1918 there was a limit of three years for fraudulent returns and no returns. Section 2, subdivision E, Act of 1913 (38 Stat. 169); section 9 (a) Act of 1916 (39 Stat. 763). Subdivision (e) of section 278 of the Act of 1924 (26 USCA § 1062 note) could not therefore affect subdivision (a), 26 USCA § 1058, and so it was observed in Burnet v. Chicago Railway Equipment Co., because such assessment and collections were not barred on June 2, 1924.

Subdivision (b) of section 278 (26 USCA § 1059) refers to deductions taken in amortization of war investments, and extends indefinitely the time finally to assess deficiencies, because of these. This was already the law under the third proviso of section 250 (d) of the Act of 1921 (42 Stat. 265), though there had been a limit in the Act of 1918, § 214 (a) (9), § 234 (a) (8), 40 Stat. 1067, 1078, as to tentative deficiencies, which indeed remained in the identical sections of the Act of 1921. Thus the final assessment of such deductions had already been extended indefinitely, and subdivision (e) so far as it touched assessments at all did not apply to subdivision (b).

Subdivision (d), 26 USCA § 1061 note, did not concern assessments but collections, and for that matter has been confined to assessments made after June 2, 1924, as we have said. Therefore, as subdivision (e), 26 USCA § 1062 note, limits the force of the section at large not only as to collection, but as to assessment, it must control assessments made under waivers, for there is no other assessment mentioned in the section on which it can operate. Unless then we construe it to mean that a waiver shall not revive a tax if the period of assessment has expired on June 2, 1924, we leave it in the air, qua assessments; it becomes brutum fulmen. This of course cannot be, and we therefore hold that the waivers did not revive the taxes. We do not find that the Commissioner used these taxes for 1919.

 The third and last point is the most important, and concerns the valuation of the buildings and machinery, and the allowance for their depreciation. The company argues first that it appears that the Commissioner proceeded by a wrong method in figuring depreciations. These first became deductible under section 234 (a) of the Act of 1918 (40 Stat. 1077) and were defined in section 234 (a) (7) of the Act of 1921 (42 Stat. 255). The claim is made therefore only from 1918 onwards. The facts stipulated are that the Commissioner took the costs of December 31, 1917, and figured the depreciations on them. Prima facie this was wrong. The fair market price or value of March 1, 1913, is the basis under the Act of 1921, and we may assume arguendo that the same is true for 1918. However, the record discloses not only the costs as of December 31, 1917, but those of the additions that had been made since March 1, 1913. The costs as of March 1, 1913, can therefore be readily reckoned, and indeed as to one of the factories the computation appears to have been made upon the basis of those costs, plus the costs of the later additions. It appears to us to be of no consequence that the Commissioner made a short cut and used the aggregate costs. We cannot assume that his figures were of the depreciated costs as of December 31, 1917, in which case alone the company could complain.

It is true, however, that he should have used not costs, but "the fair market price

897

or value" as of March 1, 1913, and this was again prima facie an error. Still we have no reason to suppose that the costs were less than the value, except as the company made some proof of it, for the burden rested upon it to show that the error was prejudicial and for this it must rest upon its own evidence. Again, so far as the costs of the property were the basis for computing its invested capital, it has no complaint if the depreciations were not taken up to December 31, 1917, for the failure to take such depreciations would increase the capital and this would be to the company's benefit. Its position is quite the opposite; that the values were much larger than those allowed. Hence we can find no damage done except in so far as the Board disregarded the company's evidence of value, and the case comes down to the cogency of what it produced.

█ Its proof was by the testimony of its president and sole shareholder, who appraised the property and estimated the proper annual rates of depreciation. He did not satisfy the Board, which disregarded his testimony, and affirmed the Commissioner, although he called no witnesses in answer. This raises the question of most importance in the case, for the testimony set much higher values on the property and gave it a much shorter life than the Commissioner had allowed. We start with the doctrine that a finding of the Board is not to be upset, when there is any evidence to sustain it; a doctrine which had been often laid down by Circuit Courts of Appeal and has now received the sanction of the Supreme Court. (Phillips v. Commissioner, 283 U. S. 589, 599, 600, 51 S. Ct. 608, 75 L. Ed. 1289.) The issue here is not quite that, but in what circumstances the Board is justified in refusing to accept uncontradicted evidence. We decided in Bonwit Teller & Co. v. Commissioner, 53 F.(2d) 381, that it might not disregard the opinion of a disinterested witness called by the taxpayer and testifying to the value of property. The Third circuit has several times held the same [Boggs & Buhl v. Commissioner, 34 F.(2d) 859; Pittsburgh Hotels Co. v. Commissioner, 43 F.(2d) 345; Nichols v. Commissioner, 44 F.(2d) 157], though it has indeed added a corollary that the Board may act upon its own information, if especially qualified. On the other hand in Patterson v. Commissioner, 42 F.(2d) 148, we refused to accept the uncontradicted testimony of a stockbroker as to the value of shares, a decision not noticed in Bonwit Teller & Co. v. Commissioner. There is a possible distinc-

tion between our decisions in that in the earlier there was some basis in the facts for valuing the shares to be appraised at a different amount. Finally in Dempster Mill Mfg. Co. v. Burnet, 46 F.(2d) 604, the Court of Appeals for the District of Columbia held that the Board was bound to accept the appraisal of the taxpayer's president. This decision seems to be on all fours with the case at bar, except for the fact that here the witness was also the sole shareholder, a distinction we should not care to press.

█ A jury need not accept the opinions of even a bevy of disinterested witnesses (Head v. Hargrave, 105 U. S. 45, 26 L. Ed. 1028); nor need a judge (The Conqueror, 166 U. S. 110, 131, 17 S. Ct. 510, 41 L. Ed. 937). It is hard to see why the Board should be more constrained; it acts as a judicial body. Assuming for argument however that it must, when the witnesses, or even one, are impartial, it is quite another thing to hold that it must take the opinion of the taxpayer himself as to the value of his own property. Pushed to such an extreme, the doctrine appears to us altogether untenable for the most obvious reasons. Perhaps when the issue is of facts of observation, where the truth depends only upon recollection and honesty, it may be otherwise, but of all things value is the most uncertain. Opinions about it are prophecies, whose truth cannot ordinarily be verified save where the property is in fungibles, and there is a concourse of buyers and sellers. As to property like that at bar the best opinion is little more than a guess. These factories were in the country, situated on streams, dependent in part upon them for power. They had their history, their good will, their own individuality; it was a most difficult matter even with disinterested evidence to arrive at their equivalent in money. To say that the judgment of one who had everything to gain by the result must be taken as absolute seems to us to deny all tolerable latitude to judicial conclusion.

It is true that in these proceedings the Board is to follow the rules of evidence in equity of the courts of the District of Columbia (section 1219, title 26, U. S. Code [26 USCA § 1219]), and the company insists that the point is therefore ruled by Dempster Mill Mfg. Co. v. Burnet, supra, 46 F.(2d) 604. But we do not so construe that section; it was to settle how evidence should be taken, and what should be competent. This case does not turn on any of these, but upon how the Board must decide the issues. However

disguised, that question is not determined by rules of evidence.

The company bore the risk of persuading the tribunal of its own selection. It has failed, and that failure is due to the inevitable unreliability of the evidence which it presented. Apparently it has failed altogether; the Board was not moved at all. Had it adopted a valuation intermediate the witness' appraisal and that of the Commissioner, the decision might appear to be without support, not to be the result of a judgment drawn from sources accessible to both parties, ordinarily a condition upon any judicial action. Even so, it is hard to see how any one but the Commissioner could complain. But we need not consider that situation; here the Board left the appraisals as it found them. Such a case is the usual one where the loss must fall upon the party having the affirmative.

Order reversed; cause remanded for further proceedings in conformity with the foregoing.

CHASE, Circuit Judge, dissents without opinion as to that part of the foregoing relating to the first and second questions on the merits.